[No. E013422. Fourth Dist., Div. Two. Sept. 12, 1996.]

In re the Marriage of JOHN L. and BETH E. BELL.
JOHN L. BELL, Respondent, v.
BETH E. BELL, Appellant.

COUNSEL

Henry V. Cleary for Appellant.

John L. Bell, in pro. per., for Respondent.

OPINION

**RAMIREZ, P. J.**—Beth E. Bell (Wife) appeals from the bifurcated judgment dividing the property of the parties following dissolution of her 20-year marriage to John L. Bell (Husband). In particular, Wife objects to the trial court decision to attribute to Wife all the costs, but not the benefits, resulting from her embezzlement from her employer over a period of five years. We find certain of Wife's contentions have merit and we reverse.

FACTS

The facts underlying this case are largely undisputed. Husband and Wife were married in 1971 and separated in May 1991. During the early part of the marriage both parties worked, but in 1979 Husband became ill and retired from active employment. They sold their home in Pasadena on a contract of sale and moved to Palm Desert where they purchased their present mobile home and lot. Following the move the parties started a sandwich-making business. They sold the sandwich shop in 1982 or 1983 and Wife started work as a ticket taker for the Palm Springs Aerial Tramway,[1] earning an hourly salary.

Starting in 1985, and continuing until her arrest on September 20, 1990, Wife embezzled funds from her employer. A civil action was filed against both parties by the Palm Springs Aerial Tramway in 1990 seeking to recover

---

[1] The Mount San Jacinto Winter Park Authority, a public agency, is commonly referred to as the Palm Springs Aerial Tramway and will be referred to that way in this opinion.

the embezzled funds.[2] The parties settled that suit for $150,000, and the suit was dismissed.

The parties separated in May 1991 and Husband filed a petition for dissolution in August 1991. On the first day of trial in the dissolution action, in October 1992, the parties stipulated that the value of the mobile home of the parties was $208,000; that the value of Wife's Jet Propulsion Laboratory (JPL) pension was $4,400-$4,800; and that the value of Wife's pension with the Palm Springs Aerial Tramway Defined Benefit Pension Plan was $8,400-$9,200. Husband testified at that time that he was 66 years old and suffering from health problems, and that his income consisted of $779 per month from Social Security. In an income and expense declaration filed at that time Husband stated monthly expenses of $1,232.70.

In December 1992 the parties entered a stipulation to bifurcate the status of the marriage from the property issues, and the marriage was dissolved at that time. An income and expense declaration filed by Wife in January 1993 indicated that she had a monthly income of $900 per month from her employment as a housekeeper, and expenses of $835 per month.

On the second day of trial, in January 1993, it was stipulated that Wife had not told Husband that she had embezzled funds, and that Husband's first actual knowledge of the embezzlement was when Wife was arrested. Wife testified that she had subsequently been convicted of the crime of embezzlement.

During trial the court heard testimony from Husband, from Wife, and from Karl Anderson, an accountant hired by the attorney who had represented Husband and Wife in the civil action brought by the Palm Springs Aerial Tramway. Mr. Anderson testified that he had been retained "in order to compute a calculation as to the embezzlement by Mrs. Bell."

I. *Income of the Parties*

Husband testified that he received a pension of $15,600 per year[3] as his sole source of income between the time the parties moved to the desert in 1979 and the time Wife was arrested, except for the period during which they had the sandwich business.

Wife testified that she had deposited the embezzled funds in bank accounts and had used the funds to buy certificates of deposit. She also

---

[2]The first amended complaint in that action, along with the answer filed by Husband and Wife and the subsequent request for dismissal, are the documents included in Wife's request for judicial notice filed with this court July 15, 1994. That request is hereby granted.

[3]For reasons that are not explained Husband was not receiving pension benefits in 1993, although the pension apparently continued at least through 1990.

testified that she had used the money to buy groceries, go to the hairdresser and go out to dinner, and that she had given Husband a $100 per month allowance. She stated that she had bought presents for Husband with the money, including a $2,500 watch and an identification bracelet. Wife testified that she had never opened an account in her name alone and that all the money had been deposited in joint accounts.

Wife testified that the mortgage on the residence of the parties had been prepaid for about 19 months at the time of her arrest. She also testified that the parties had purchased a Cadillac in 1989 and had accelerated the payments so that the car was completely paid for by 1990.

Counsel for Wife offered to the court a chart prepared by him, on the basis of information given to him by Wife, that purported to demonstrate that during the period 1985 to 1990 the community spent $129,000 more than it earned through legitimate sources.

## II. *Assets of the Parties in 1985*

Husband testified that assets held by the parties in 1985 consisted of the residence, the furniture, two automobiles, the bank accounts, and two accounts receivable from the sale of the business and the sale of the condominium.

Mr. Anderson testified that as of 1984, Husband and Wife had approximately $20,000 in savings accounts. The balance due to Husband and Wife at that time on the note from the sale of their condominium in 1979 was $62,133.53; the balance due as of 1984 on the note arising out of the sale of their business was $25,195. Wife testified that the balance due to the parties from the sale of the condominium was fully paid off by 1987. Mr. Anderson testified that tracing the funds from the payments on the two notes received by Husband and Wife prior to 1990 was very difficult because Husband and Wife had 30 or 40 different bank accounts.

## III. *Assets at the Time of Separation*

Mr. Anderson testified that in September 1990 the parties had assets of $205,000 in cash and annuities alone. The parties settled with the Palm Springs Aerial Tramway for $150,000 out of their liquid assets. Mr. Anderson testified that the $150,000 figure was arrived at by examining the cash deposits into Husband and Wife's bank accounts, combined with two $30,000 automobiles purchased with cash by Husband and Wife.

Mr. Anderson testified that the net worth of the parties in 1990 after settlement of the civil action and payment of attorney fees would have

consisted of the house worth $150,000, on which they owed $20,000, two cars free and clear, and some personal property. Counsel for Wife introduced statements showing the existence, at the time of trial, of approximately $31,000 in unredeemed bonds that had been purchased with community property. Counsel also elicited testimony from Husband indicating that at the time Wife left the residence in May 1991, there was enough "cash" remaining for Husband to have paid his attorneys $12,000.

In an effort to establish that the community was not harmed and was in fact benefited by the embezzlement, counsel for Wife elicited testimony to show that cash assets remained after the civil settlement. The parties stipulated that there was about $20,000, plus savings bonds, left after payment of the $150,000 settlement and $55,000 in attorney fees. The court then commented that the parties were in about the same position as in 1984, before the embezzlement.

## IV.  *Value of the Use of the House by Husband*

As of September 10, 1992, the balance due on the parties' house was $5,122.46. All monthly payments on the house following that date were made by Husband. Monthly payments on the house were approximately $338.

The parties stipulated that the fair monthly rental value of the mobile home was $1,200 per month. Wife then claimed that $1,200 per month for use of the house should be charged to Husband for the benefit of the community, with proper credit to him for payments made by him.

## V.  *Tax Obligation*

Mr. Anderson stated that according to amended tax returns prepared by him, the federal tax due as of December 1992 was $60,874.07, and the state tax due was $18,974. Of those amounts, a total of $28,290 was attributable to penalties and interest.

## VI.  *Court's Statements*

On the first day of trial in October 1992 the court indicated that it found the case of *In re Marriage of Stitt* (1983) 147 Cal.App.3d 579 [195 Cal.Rptr. 172], a case that also involved embezzlement, to be directly applicable to the case before it. In *Stitt* the court held that the party charged with an intentional tort was to be held fully responsible, on dissolution, for payment of attorney fees incurred in defending the criminal and civil actions arising out of the tort.

On the second day of trial in January 1993 the court reiterated that "I indicated that . . . Mrs. Bell is going to bear the burden of the wrongdoing between these two people. [¶] [W]hen it comes to allocating assets based on the Stitt case, every question I have is going to be resolved against her about [who is] going to bear this burden . . . ." The court then stated that evidence of whether the community benefited from the embezzled funds was irrelevant. The court distinguished the case of *In re Marriage of Hirsch* (1989) 211 Cal.App.3d 104 [259 Cal.Rptr. 39], in which the community was held liable for the costs of the civil liability of the husband arising out of his negligence, noting that the present case involved criminal activity, not negligence, and stating further that "in the long run as opposed to the Hirsch case this didn't benefit the community. It destroyed it."

At the end of trial Husband argued that use of the house should be awarded to him as a form of support. He asked the court to apply the decision in *In re Marriage of Stitt, supra,* 147 Cal.App.3d 579, as the court had indicated it intended to do, and he asked the court to assess to Wife the interest and penalties due on the income tax. Wife agreed that she should be held liable for the interest and penalties due on the income tax. She contended, however, that the tax itself should be paid by the community since the community had had the benefit of the income. She argued further that the *Stitt* decision did not deal with reimbursement of embezzled funds, but only with payment of attorney fees, and she asked the court to allocate to the community the cost of the civil settlement.

On July 1, 1993, the court entered judgment on the remaining issues in the dissolution as follows:

## I.   Division of Property

A.   *To Husband*:

1.   Mobilehome and contents   $208,000.00

     Less encumbrance   ($ 6,000.00)

     Equity   $202,000.00

2.   U.S. savings bonds (value)   $ 15,000.00 (Face value $30,000.00)

*Total* $217,000.00

B.  *To Wife*:

| | | |
|---|---|---|
| 1. | Legal fees/accounting fees | $ 55,225.00 (Paid by community) |
| 2. | Tramway pension | $ 9,000.00 |
| 3. | JPL pension | $ 4,600.00 |
| 4. | Civil settlement | $150,000.00 (Paid by community) |
| 5. | 1988 Mazda | $ 10,000.00 |

*Total*     *$228,825.00*

II.   Division of Debts

| | | |
|---|---|---|
| 1. | Federal tax liability | $ 61,000.00 approx. |
| 2 | State tax liability | $ 23,000.00 approx. |
| | Total tax liability | $ 84,000.00 approx. |
| 3. | Karl Anderson, C.P.A. | $ 1,240.40 |

*Total debts related to embezzlement*     *$ 85,240.40*

The court ordered that Wife was to hold Husband harmless from the above debts, and ordered Wife to pay the debts "[u]nder the *Stitt* case." The court ordered Husband to pay a Visa card debt in the amount of $3,500 that was incurred by him after separation. The court retained jurisdiction over spousal support but awarded no support to either party. Wife filed a motion for a new trial, which was denied, and she then filed this appeal.

DISCUSSION

I.   *Characterization of the Obligations as Community or Separate*

■   On appeal Wife attempts to distinguish the decision in *In re Marriage of Stitt, supra*, 147 Cal.App.3d 579, and argues that the rule applicable to the present case is found in *In re Marriage of Hirsch, supra*, 211 Cal.App.3d 104.

In *In re Marriage of Stitt, supra*, wife embezzled from her employer. The appellate court noted that ". . . there is no evidence the embezzlement

jointly benefited husband and wife." (147 Cal.App.3d at p. 586.) Wife's separate property was sold to raise funds to pay the $15,000 in restitution to the employer that was required as a condition of wife's probation following her conviction. (*Id.*, at p. 584.) That payment was not in dispute at the time of the dissolution; thus, the question of whether repayment of the embezzled funds was a community obligation was not before the court. Following separation of the parties wife received a bill from her attorney, which she paid. The trial court in the dissolution held that wife alone was liable for her attorney fees and the appellate court affirmed. Citing former Civil Code section 5122, now Family Code section 1000,[4] which addresses the issue of liability of a married person to third parties, the court in *Stitt* found "a legislative direction that between the spouses the mere fact of marriage should not change the usual rules of personal responsibility for the consequences of criminal or tortious activity." (147 Cal.App.3d at p. 588.)

In *In re Marriage of Hirsch*, *supra*, the parties were married from 1963 to 1970. From 1966 until 1971, husband sat on the board of directors of a bank in which he owned stock. (211 Cal.App.3d at p. 106.) Husband was subsequently named in three lawsuits arising out of his service on the board. On the advice of counsel, he settled all three suits and then sought reimbursement from wife for $423,130.19, one-half the amount he spent on attorney fees and settling the suits. (*Ibid.*) Husband testified that his reason for serving on the board was to enhance his business potential, and thus to benefit the community. Husband's attorney testified that he believed husband's liability would have been limited to the negligence causes of action for husband's " 'gross negligence' " in failing to heed news articles that should have put the board on notice of the problem that led to the bank's collapse. (*Id.*, at p. 107.) Relying on *In re Marriage of Stitt*, the trial court held that the costs were incurred as a result of husband's tortious conduct, and the court denied husband's motion to have the liabilities declared community obligations. (211 Cal.App.3d at p. 108.)

The appellate court reversed, noting the absence of guidelines for classifying, as either separate or community, obligations arising out of allegedly

---

[4]Family Code section 1000 states, in relevant part: "(a) A married person is not liable for any injury or damage caused by the other spouse except in cases where the married person would be liable therefor if the marriage did not exist.

"(b) The liability of a married person for death or injury to person or property shall be satisfied as follows:

"(1) If the liability of the married person is based upon an act or omission which occurred while the married person was performing an activity for the benefit of the community, the liability shall first be satisfied from the community estate and second from the separate property of the married person.

"(2) If the liability of the married person is not based upon an act or omission which occurred while the married person was performing an activity for the benefit of the community, the liability shall first be satisfied from the separate property of the married person and second from the community estate."

tortious conduct. (*In re Marriage of Hirsch, supra,* 211 Cal.App.3d at p. 108.) The court acknowledged that the " 'benefit of the community' " language of Family Code section 1000 "is useful" in characterizing an obligation as separate or community, but noted that the statute itself is a creditor's statute. (211 Cal.App.3d at p. 110.) The court stated that the correct focus in assigning obligations between the spouses is former Civil Code section 4800, dealing with division of property on dissolution. That code section is now distributed among various sections of division 7 (§ 2500 et seq.) of the Family Code.

Under the facts of our case, the analysis under either section appears to lead to the same result. Under Family Code section 1000, subdivision (b), the liability of a married person is to be satisfied from separate or community property depending on whether the act or omission complained of "occurred while the married person was performing an activity for the benefit of the community."

Family Code section 2625 provides in relevant part that "all separate debts, including those debts incurred by a spouse during marriage and before the date of separation that were not incurred for the benefit of the community, shall be confirmed without offset to the spouse who incurred the debt." Here, too, the question of whether a debt is characterized as a "separate debt" might depend on whether it was incurred for the benefit of the community. We must therefore look at how these distinctions have been applied.

The major differences between the two cases cited by the parties are that in *In re Marriage of Stitt, supra,* 147 Cal.App.3d 579, the offense was an intentional tort and the court found there was no evidence of a benefit to the community, while in *In re Marriage of Hirsch, supra,* 211 Cal.App.3d 104, there was evidence of no more than gross negligence and evidence also that the community benefited from the acts that led to the liability. In the present case we have an intentional tort (as well as a crime) but we also have benefit to the community. Applying the principles of the cited cases to the facts before us, we conclude that the trial court correctly decided that Wife should be held liable for the attorney fees required for her defense in both the civil and the criminal actions, and that she should be liable also for the state and federal tax liability arising out of the embezzlement, including interest and penalties. Wife engaged in intentional tortious and criminal activity and knowingly accepted the risk that she would be caught and would have to face the consequences. Husband, who knew nothing of the risk and could do nothing to avoid it, should not in fairness bear the same burden once it did go wrong. In this regard our decision here follows the ruling in *Stitt.*

As to the $150,000 civil settlement, however, we find the considerations are different. Wife was still engaged in an intentional tort, and Husband still knew nothing about it. Here, however, there was uncontradicted testimony that the community received the benefit of the embezzlement. Even if the numbers were somewhat uncertain, it was apparent that the community had received a major infusion of funds over the years, and it was clear that all the embezzled funds had been put to community, and not separate, use. Mr. Anderson testified that the amount of the settlement was based on estimates of the amount that had been taken, so the settlement was no more than an attempt at restitution. To that extent, directing payment of the settlement by the community would do no more than bring it back to where it had been. Even the court commented that the circumstances of the parties in 1990 were not substantially different from their circumstances in 1984.

We hold that the trial court erred by allocating the entire $150,000 settlement, which had previously been paid out of community property, to Wife as part of her share of the community property distribution. The community had shared in the benefit and could properly be asked to share in the cost. Although this was not exactly the outcome in *In re Marriage of Hirsch, supra,* 211 Cal.App.3d 104, dictum in *Hirsch* indicated the court there would have approved such a result in this case; the court there stated, "For example, had wife put the embezzled funds into a community account or other community property, it would have been appropriate for the community to bear the corresponding loss." (*Id.,* at p. 110, fn. 8.)

Here we find that the trial court's resolution of this issue was not supported by the evidence presented and does not reflect a correct analysis and application of the law and we therefore reverse on this issue.

II. *Equal Division of the Community Property*

■ Also troubling is the trial court's apparent disregard for the requirement of Family Code section 2550 that "the court shall . . . divide the community estate of the parties equally." The court failed to include Husband's car as a community asset to be divided although Husband testified that he had possession of the car at the time of separation and that he had refinanced the car for $15,000. With or without that asset, the division of the property is not, on its face, equal. While there may be an explanation for the

discrepancy, it was not offered by the court and is not apparent from the record.[5]

## III. *Rental Value of the Residence*

Finally, we question the court's failure to address the issue of Husband's use of the residence of the parties between the date of separation and the time of trial. The parties stipulated that the rental value of the mobilehome was $1,200 per month. They acknowledged that Husband had had exclusive use of the home following separation; and the record showed that the house payments were in the range of $350 per month. In light of the rule set forth in *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 374 [217 Cal.Rptr. 301], that the community is entitled to reimbursement for the value of the exclusive use of a community asset by one of the parties following separation, the court was obligated either to order reimbursement to the community or to offer an explanation for not doing so.

## DISPOSITION

The judgment on the bifurcated property issues is reversed. Each party to bear its own costs on appeal.

Hollenhorst, J., and Richli, J., concurred.

A petition for a rehearing was denied October 4, 1996, and appellant's petition for review by the Supreme Court was denied December 11, 1996.

---

[5]On appeal both parties have asked this court to divide the missing savings bonds that had been acquired with community funds. At oral argument counsel for Wife asked us to direct the trial court on remand to divide the missing bonds.

We recognize that the parties presented evidence at trial that the bonds had been purchased. The trial court may wish to consider whether the missing bonds were part of the community estate at the time the parties separated and whether they should be divided by the court.